## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **CYNTHIA O.**[1] | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )   **Civil No. 3:23-cv-00854-GCS** |
| | ) |
| **COMMISSIONER of SOCIAL** | ) |
| **SECURITY,** | ) |
| | ) |
| **Defendant.** | ) |

## <u>MEMORANDUM & ORDER</u>

**SISON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff, through counsel, seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits ("DIB").[2]

### PROCEDURAL HISTORY

On September 10, 2019, Plaintiff filed an application for DIB alleging a disability onset date of July 13, 2017. After holding an evidentiary hearing on March 29, 2022, an Administrative Law Judge ("ALJ") denied the application on June 14, 2022. On January 24, 2023, the Appeals Council denied Plaintiff's request for review, making the ALJ's

---

[1]     Plaintiff's full name will not be used in this Memorandum & Order due to privacy concerns. *See* FED. R. CIV. PROC. 5.2(c) and the Advisory Committee Notes thereto.

[2]     This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. § 636(c). *See* (Doc. 14).

decision the final agency decision subject to judicial review. (Tr. 1). Plaintiff exhausted

administrative remedies and filed a timely complaint with this Court.

## ISSUES RAISED BY PLAINTIFF

Plaintiff raises the following issues:

1.      The ALJ failed to properly evaluate medical opinions.

2.      The ALJ failed to properly evaluate Plaintiff's pain complaints.

3.      The ALJ failed to build a logical bridge from the evidence to the Residual
Functional Capacity ("RFC").

4.      The ALJ erred in finding Plaintiff's anxiety and depression were non-severe
impairments.

## APPLICABLE LEGAL STANDARDS

"The [SSA] provides benefits to individuals who cannot obtain work because of a

physical or mental disability." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1151 (2019). Disability is

the inability "to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than twelve

months." *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018) (citing 42 U.S.C. §

423(d)(1)(A)).

To determine whether a claimant is disabled, the ALJ considers the following five

questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have

a severe impairment? (3) Does the impairment meet or medically equal one of a list of

specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. A negative answer at any step, other than at step 3, precludes a finding of disability. The claimant bears the burden of proof at steps 1–4. Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *See Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Accordingly, this Court is not tasked with determining whether or not Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *See Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek*, 139 S. Ct. at 1154 (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does *not* reweigh evidence, resolve conflicts, decide

questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

### THE DECISION OF THE ALJ

The ALJ followed the five-step analytical framework described above. She determined Plaintiff met the insured status requirements through March 31, 2021, and Plaintiff did not engage in substantial gainful activity since her alleged onset date of July 13, 2017. The ALJ found that Plaintiff had the following severe impairments: degenerative disc disease, osteoarthritis, fibromyalgia, bursitis, and asthma. She also found that Plaintiff had the following non-severe impairments of irritable bowel syndrome, gastroesophageal reflux disease, kidney stones, hypertension, obesity, depression, and anxiety. (Tr. 141-142).

The ALJ found that Plaintiff had the RFC "to perform light work as defined in 20 CFR 404.1567(b) except: she is able to stand and/or walk six hours each in an eight-hour workday and no limitations sitting. She is able to lift, carry, push and/or pull twenty pounds occasionally and ten pounds frequently. She is able to occasionally climb ramps and stairs, but should never climb ropes, ladders or scaffolds. She is able to frequently stoop, and occasionally kneel, crouch and crawl. She is able to frequently reach overhead with her left upper extremity. The claimant should avoid concentrated exposure to

extreme cold, humidity and pulmonary irritants (such as dust, odors, fumes, gases and poorly ventilated areas)." (Tr. 146). The ALJ found that Plaintiff could perform her past work as a retail manager. (Tr. 152). Thus, the ALJ found Plaintiff was not disabled. (Tr. 154).

### THE EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in preparing this Memorandum & Order. The following summary of the record is directed to the Court's discussion.

**1.    Evidentiary Hearing**

Plaintiff was represented by an attorney at the telephone hearing on March 29, 2022. During the hearing, Plaintiff and the vocational expert ("VE"), Dr. Delores E. Gonzalez, testified. (Tr. 138, 153, 171-173).

Dr. Gonzalez classified Plaintiff's past work as follows: "cashier/checker. That's 2.11.462-014. That's light, semi-skilled, SVP 3, but it was medium as performed. . . . retail manager, and that's 185.167-046. It's light, skilled, SVP 7, but it was medium as performed. . . . delicatessen counter worker, and that's 317.664-010. . . . It's medium, unskilled, SVP 2." (Tr. 172-173). She noted that while Plaintiff was a cashier, she lifted 25 pounds; as a retail manager, she lifted 50 pounds; and as a delicatessen counter worker, she lifted 50 pounds. (Tr. 172).

Plaintiff testified that she lives with her retired husband in a house. (Tr. 173-174).

Once a month, they have a cleaner do the household chores. Her husband does the cooking, the laundry, and the grocery shopping. (Tr. 174-175). She has a driver's license with no restrictions. *Id*.

Plaintiff thinks that she is disabled because of pain. Specifically, pain in her left shoulder, lower back, right knee, left and center back, upper thigh and left leg, bursa in upper thigh, both knees, and both feet. She is 5'6'' tall and weighs 210 pounds. She also has asthma and had gastric bypass surgery in 1999. (Tr. 175). Plaintiff experiences arthritis in her left shoulder, hips, neck, knees, feet, thumbs, hands, and back. (Tr. 175-176).

Plaintiff stopped working after she was injured on vacation, which resulted in surgery on her right knee and left foot. She has not been the same since that incident. (Tr. 176). Because of these injuries, Plaintiff cannot do any household chores, and she has trouble standing, walking, sitting, bending, and lifting. She can only stand for about ten minutes before the pain becomes intolerable. This pain is in her lower back, the right side and left side of her lower back, and the middle. (Tr. 177). She can only walk about ten minutes with the pain. Her gait is off, and her left Achilles is inflamed; therefore, she wears flip flops. This pain is in her foot, knees, and back. She can only sit for about ten minutes because of the pressure or weight on her back. (Tr. 178).

As a result of this pain, Plaintiff lays in bed most of the day, around 20 hours. She testified that she gets up, takes care of her personal needs, eats breakfast, cleans her CPAP machine, brushes her teeth, and then goes back to bed. She sits up to eat in bed and gets

up from the bed to use the restroom. (Tr. 178). She testified that all her days are bad days. Bending, kneeling, and raising her left shoulder above her head make her pain worse. (Tr. 179). The arthritis in her hands makes it hard to grip and open things, so her husband does that for her.[3] (Tr. 180). The most she can lift is a gallon of milk. She only leaves the house for doctor appointments. (Tr. 181).

Additionally, Plaintiff suffers from depression, bipolar disorder, and anxiety. She also experiences brain fog, forgetfulness, and memory issues. She further has problems with motivation, concentration, and directions. (Tr. 181). She avoids going out in public because it triggers her and causes anxiety attacks. She has trouble sleeping because of the pain as it is hard to get comfortable. (Tr. 182).

Also, Plaintiff experiences migraines about four times a month. She takes medication for them. (Tr. 183). And, a couple times a year Plaintiff gets kidney stones, which she cannot pass on her own. She must have a procedure to remove them and to have a stent placed.

Dr. Gonzalez testified that a hypothetical individual, who was the same age as Plaintiff and had the same education and past work consistent with what was described for the Plaintiff, could generally perform as a cashier/checker and retail manager, but not as Plaintiff had performed those jobs. (Tr. 187). She would, however, have to adhere to the following limitations:   limited to light exertional work, stand and/or walk 6 hours

---

[3]      She had carpal tunnel surgery on both hands. (Tr. 180).

in an 8-hour workday; no limitations sitting; lift, carry, push, and or pull ten pounds frequently and 20 pounds occasionally; never climb rope, ladders, or scaffolds; occasionally climb ramps and stairs; frequently stoop and frequently reach overhead with the left upper extremity; occasionally kneel, crouch, and crawl; avoid concentrated exposure to extreme cold, humidity, and pulmonary irritants. *Id.* Dr. Gonzalez noted that an absence once a month would be acceptable, but nothing more. She also noted, depending on the employer, that being off task would range from zero to 10%. (Tr. 188). She testified that both jobs, depending on the job site, could be performed with the sit/stand option every 30 minutes. (Tr. 189). Dr. Gonzalez further testified that the retail manager job has more leeway in relation to off task behavior than the cashier/checker job would have. (Tr. 190). She also testified that the job could not be performed if the individual was limited to occasional handling bilaterally. Further, if a person needed a sit/stand option every ten minutes that would be allowed if that person remained on task. (Tr. 191). Lastly, she testified that a person limited to only standing four hours of an eight-hour day could not perform the work. (Tr. 192).

**2.    Relevant Medical Records**

**a.    Dr. Eric C. Whittenburg, DPM**

From July 2017 through June 2019, Plaintiff saw Dr. Eric C. Whittenburg, DPM, 13 times for an Achilles Tendon tear of her left foot. (Tr. 550-616). Plaintiff first saw Dr. Whittenburg on July 24, 2017, for an issue with her left foot/ankle, wherein she was

diagnosed with Achilles tendinitis, left leg, and ordered to continue wearing a cam walker. (Tr. 602-604). Plaintiff returned to Dr. Whittenburg for a follow-up on August 7, 2017, stating that she was improving but that her foot was still tender. Dr. Whittenburg ordered her to continue her current plan. (Tr. 590-601). A month later, Plaintiff treated with Dr. Whittenburg and reported no change since the last visit. Dr. Whittenburg referred Plaintiff to physical therapy and for a possible MRI. (Tr. 596-598).

On November 6, 2017, at the request of Dr. Whittenburg, an MRI of Plaintiff's left foot was performed due to the pain in Plaintiff's Achilles tendon. (Tr. 611-616, 1370). The results of the MRI showed a circumferential thickening of the Achilles tendon and an increase signal within the tendon, which was consistent with a diagnosis of tendinosis. (Tr. 611-616, 1370). On November 15, 2017, Plaintiff followed up with Dr. Whittenburg with complaints of recurring heel pain and reported no change since the last visit. Dr. Whittenburg fitted Plaintiff with a below-the-knee fiberglass cast. (Tr. 592-595). Two weeks later, Plaintiff saw Dr. Whittenburg for a cast check/removal. Plaintiff stated she was improving. Plaintiff was fitted with a below-the-knee fiberglass cast. (Tr. 588-591). Thereafter, Plaintiff treated with Dr. Whittenburg during a follow-up visit. She noted that she was improving, but that she had cramps in her foot the last three days. Plaintiff was fitted with a cam walker. (Tr. 584-587). At the end of December 2017, Plaintiff followed up again and reported that her pain was worse since wearing the cam boot. Thus, Plaintiff was fitted with a fiberglass cast on her right foot. (Tr. 580-583).

On January 10, 2018, Plaintiff saw Dr. Whittenburg, and her cast was removed. She reported that she was improving, but her left foot had a small spot that continued to give her pain. Dr. Whittenburg discussed surgical debridement and repair of the tendon with Plaintiff. (Tr. 576-579). One week later, Plaintiff treated with Dr. Whittenburg and reported no change since the last visit. Dr. Whittenburg informed Plaintiff of the conservative and surgical treatment options. (Tr. 559-562).

On February 15, 2018, Dr. Whittenburg performed an Achilles tendon repair with a graft on Plaintiff's left foot. (Tr. 608-610). Two weeks later, Plaintiff saw Dr. Whittenburg for a post-op surgery follow-up. (Tr. 568). On March 14, 2018, and April 4, 2018, Plaintiff visited Dr. Whittenburg for additional follow-ups and reported that things were improving. On March 14, 2018, Dr. Whittenburg ordered physical therapy and transition to a cam walker. (Tr. 564-575). Plaintiff last saw Dr. Whittenburg on June 3, 2019, for a new complaint regarding pain in her left ankle (on the back area). Dr. Whittenburg prescribed a cam walker. (Tr. 569-572).

### b.    Signature Orthopedics & Premier Care

From July 2017 to March 2021, Plaintiff saw various doctors/treaters with Signature Orthopedics & Premier Care. (Tr. 1114-50, 1355-66, 1395-1400).

Plaintiff saw Dr. Lawrence A. Kriegshauser on August 3, 2017, for complaints of persistent right knee pain. (Tr. 1114-16). At the request of Dr. Kriegshauser, an MRI of

Plaintiff's right knee was performed on August 10, 2017. The MRI revealed a tear of the lateral meniscus and a popliteal cyst. (Tr. 731, 1368, 1117).

On August 23, 2017, Plaintiff had arthroscopic surgery on her right knee to repair the torn meniscus. (Tr. 1148-50). Dr. Kriegshauser ordered physical therapy for the right knee after the surgery.

Subsequently, Plaintiff followed-up with a Family Nurse Practitioner ("FNP") for her right knee on November 14, 2017. During this visit, Plaintiff received a cortisone injection. (Tr. 1122-24).

On February 7, 2019, Plaintiff went back to see Dr. Kriegshauser for evaluation of a few months' history of chronic bilateral knee pain. Plaintiff reported her right knee was worse than her left knee, and she was experiencing intermittent popping and clicking in the right knee. Dr. Kriegshauser noted tenderness of both knees and ordered x-rays. The x-rays revealed moderate narrowing of the medial compartment and some narrowing of the patellofemoral compartment of the left knee. It also revealed severe narrowing of the medial compartment, moderate narrowing of the patellofemoral joint, and less severe narrowing of the lateral compartment with small periarticular osteophytes present. Because of the possibility of diabetes, Plaintiff only received a cortisone injection in the right knee. (Tr. 1125-30).

About six weeks later, Plaintiff followed up with Dr. Kriegshauser for her arthritic knees on March 28, 2019. Plaintiff noted that the cortisone injection in her right knee did

not help and that her left knee was bothering her more. She also reported right hip pain. Dr. Kriegshauser ordered x-rays which showed some narrowing of the joint space on her right hip. Dr. Kriegshauser noted that gel injections or viscous injections were options for her right knee as the cortisone injection did not work. During this visit, Plaintiff also had a cortisone injection in her left knee. (Tr. 1131-34).

Subsequently, Plaintiff had three Orthovisc injections performed on her right knee on April 17, 2019, April 24, 2019, and May 1, 2019. (Tr. 1135-42).

Plaintiff again saw Dr. Kriegshauser for right knee pain on September 9, 2019. Dr. Kriegshauser noted that x-rays taken of her knees showed mild osteoarthritis of the right knee and a normal left knee exam. Dr. Kriegshauser reported that her arthritis was more at the moderate level. Plaintiff informed Dr. Kriegshauser that the Orthovisc injections did not help; thus, she again tried another cortisone injection. (Tr. 1143-45).

On December 2, 2019, Plaintiff returned to Dr. Kriegshauser for chronic arthritis in her knee. Plaintiff reported that the last cortisone injection did not help. Dr. Kriegshauser noted that her recent x-rays showed some moderately advanced osteoarthritis of the knee. She was given another cortisone injection. (Tr. 1355-56, 1146-47).

Three weeks later, Plaintiff saw Dr. Robert Sigmund for worsening pain in her left shoulder. Dr. Sigmund conducted an O'Brien's test and noted that Plaintiff had pain when she reached behind her back and with cross-chest adduction. Plaintiff also had pain with forward flexion and external rotation. Dr. Sigmund ordered x-rays which revealed

a type II acromion. Dr. Sigmund also noted that Plaintiff may have mild acromioclavicular joint arthritis. Plaintiff received a cortisone injection. (Tr. 1358-62).

On February 20, 2020, Plaintiff treated with FNP Boxdorfer for a right knee cortisone injection. During this visit, Plaintiff also complained about back issues. (Tr. 1363-66).

On March 31, 2020, Plaintiff treated with Dr. Amy Zippay for complaints of pain (10/10) in multiple areas including her neck, arms, hips, and left foot. Plaintiff reported that bending, standing straight, and sitting seemed to aggravate her symptoms. She also noted that lying on her left side hurt her hips, that her lower back was "cracked in two[,]" and that she had aching and cramping in her left foot. Dr. Zippay noted that Plaintiff had physical therapy, anti-inflammatory medications, massage, ultrasound and chiropractic care. (Tr. 1389). She further noted that Plaintiff had a history of fibromyalgia. *Id*. The x-rays of her lumbar spine from this visit demonstrated that Plaintiff had Grade I L4-L5 anterolisthesis without compression deformity and mild to moderate L4-L5 and L5-S1 disc height loss with lower lumbar facet arthropathy. (Tr. 1393).

On April 30, 2020, Plaintiff returned to see Dr. Zippay for complaints of continued low back pain and for an epidural steroid injection. Prior to the steroid injection, Plaintiff's pain was 8/10 and after the injection, Plaintiff's pain was 6/10. (Tr. 1395-98). On May 14, 2020, Dr. Zippay followed up with Plaintiff via telephone. During this call, Plaintiff reported 50% improvement with the steroid injection. Plaintiff still complained

of back pain and left lower extremity symptomatology. Additionally, Plaintiff noted that she had some hip pain and had other joints with arthritis that she may want injected. (1399-1400).

Subsequently, on January 11, 2021, Plaintiff treated with Physician Assistant ("PA") Meghan Flynn for complaints regarding bilateral knee osteoarthritis. During this visit, Plaintiff had cortisone injections in both knees and x-rays performed. The x-rays revealed mild narrowing and osteophyte formation at the right knee medial compartment, minimal, if any, narrowing in the left knee medical compartment, and slight patellofemoral narrowing bilaterally with tiny osteophytes. (Tr. 1747-49).

### c. Arthritis Consultants, Inc.

On August 15, 2019, Plaintiff saw Dr. Akgun Ince for joint pain, myalgias, and difficulty sleeping. Plaintiff was referred from Dr. Neera Sharda. Dr. Ince reported that Plaintiff had a history of fibromyalgia and that Plaintiff had severe pain in her knees and ribs. (Tr. 760, 1268). Dr. Ince's examination of Plaintiff revealed bilateral swelling and tenderness in the knees. A trigger point exam was conducted, which contained the following 8 positives: occiput, low cervical, trapezius, supraspinatus, second rib, lateral epicondyle, greater trochanter, and knee. Plaintiff reported her pain to be 10/10. Dr. Ince ordered labs and x-rays of the knees and SI joints. (Tr. 762, 1270). The x-rays of Plaintiff's SI joints, right knee, and left knee were taken on August 15, 2019. As to the right knee, mild arthritic changes were noted. As to the left knee, the exam was unremarkable. And,

as to the SI joints, mild sclerotic changes along the inferior portions of the joints bilaterally were noted. (TR. 773-774, 1285-87, 1374-76).

On September 3, 2019, Plaintiff followed up with Nurse Practitioner ("NP") Zobrist for complaints of joint pain, myalgias, and difficulty sleeping. (Tr. 757, 1265). Among other things, NP Zobrist noted that Plaintiff had bilateral swelling and tenderness in both knees. A trigger point exam was conducted, which contained the following 8 positives: occiput, low cervical, trapezius, supraspinatus, second rib, lateral epicondyle, greater trochanter, and knee. Plaintiff reported her pain to be 9/10. NP Zobrist noted that Plaintiff's right knee revealed changes consistent with osteoarthritis. (Tr. 758, 1266).

On December 26, 2019, Plaintiff treated with NP Zobrist for a rheumatology follow-up. Like past visits, NP Zobrist noted bilateral swelling and tenderness in the knees. A trigger point exam was conducted, which contained the following 8 positives: occiput, low cervical, trapezius, supraspinatus, second rib, lateral epicondyle, greater trochanter, and knee. (Tr. 1262-63). Plaintiff also reported a pain score of 8.5/10. *Id.* Thereafter, Plaintiff had a telephone visit with NP Zobrist on April 21, 2020. NP Zobrist noted that Plaintiff was "doing pretty well," that she had been getting "back injections per Dr. Zippay," and that she was "walking the dog for exercise." (Tr. 1541-42).

In 2021, Plaintiff treated with NP Zobrist on May 18, 2021, and June 24, 2021. During these visits, Plaintiff had bilateral swelling and tenderness in the knees. Trigger point exams were conducted, which contained the following 8 positives: occiput, low

cervical, trapezius, supraspinatus, second rib, lateral epicondyle, greater trochanter, and

knee. (Tr. 1532-39). She also reported a pain score of 8/10 and of 9.5/10, respectively. *Id.*

In her last appointment, Plaintiff reported that she was "always in pain." (Tr. 1532).

### d.    Physical Therapy

From September 13, 2017, through November 13, 2017, Plaintiff went to St.

Anthony's Sports & Therapy Services ("St. Anthony's") for her right knee and left

Achilles tendon a total of 14 times. (Tr. 617-659, 1794-1804). After her Achilles tendon

surgery, Plaintiff returned to physical therapy at St. Anthony's for her Achilles tendon

from March 26, 2018, to July 6, 2018, for a total of 11 visits. (Tr. 660-720). Thereafter,

Plaintiff had physical therapy for her back in September 2018 at St. Anthony's. (Tr. 721-

730). Additionally, in September 2019 through October 2019, Plaintiff went to physical

therapy at Mercy Services for her right knee a total of 5 times. (Tr. 932-974).

### e.    State Agency Consultants/Doctors

On February 7, 2020, Rod E. Hoevet, PsyD, performed a consultative psychological

exam on Plaintiff that lasted 60 minutes. Dr. Hoevet reviewed Plaintiff's records from

Arthritis Consultants (8/15/19). During this evaluation, Plaintiff complained of arthritis,

fibromyalgia, depression, and anxiety. Dr. Hoevet found no limitations in understanding

or applying relevant information or with her memory. He further found no limitations

with respect to the following:   interacting with others; concentration, persistence and

pace; and adaptation and self-management. He diagnosed her with persistent depressive disorder (provisional). (Tr. 1349-52).

On April 4, 2020, Dr. Lionel Hudspeth, PsyD, a state agency consultant, opined that Plaintiff had a medically determinable impairment that did not satisfy the diagnostic criteria. Specifically, Dr. Hudspeth found that Plaintiff only had a mild limitation with concentration, persistence, or the maintenance of pace. (Tr. 203-206).

On May 8, 2020, Frank Mikell, a state agency doctor, opined that Plaintiff could do light work with only occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand and/or walk 6 hours in 8-hour workday; sit 6 hours in 8-hour workday, push and balance unlimited, occasionally climb ramps, stairs, stooping, crouching, kneeling and never crawl; avoid concentrated exposure to extreme cold and heat, humidity, noise, vibration, fumes, odor, dusts, gases, poor ventilation, and hazards. (Tr. 206-212). Similarly, on May 18, 2021, Cristina Orfei, another state agency doctor, opined that Plaintiff could do light work. (Tr. 225-242).

On April 17, 2021, Dr. Adrian Feinerman, as a consultive examiner, examined Plaintiff in his office for 30 minutes. In preparation for the visit, Dr. Feinerman reviewed the following records: a record regarding back pain dated April 30, 2020; a telephone visit record dated May 14, 2020, regarding a post-Lumbar spine steroid injection; and a December 18, 2019, record regarding a routine follow-up. Dr. Feinerman found the following: "patient is able to sit, stand, walk, hear, and speak normally. She is able to lift,

carry, and handle objects without difficulty. The claimant is able to handle funds on her own behalf." (Tr. 1509-17).

DISCUSSION

The Court initially addresses Plaintiff's second argument that the ALJ failed to properly evaluate Plaintiff's pain. The Court agrees that the ALJ did not adequately explain her assessment of Plaintiff's subjective complaints. Specifically, the decision fails to explain why essentially stable/unremarkable findings and evidence of minor degenerative changes were inconsistent with Plaintiff's subjective complaints. Based on the foregoing, the Court finds that remand is required for a proper evaluation of the Plaintiff's subjective symptoms.

The ALJ is "in the best position to determine a witness's truthfulness and forthrightness . . . [and thus, the] court will not overturn an ALJ's credibility determination unless it is 'patently wrong.'" *Shideler v. Astrue*, 688 F.3d 306, 310–311 (7th Cir. 2012) (quoting *Skarbek v. Barnhart*, 390 F.3d 500, 504–505 (7th Cir. 2004)). But, when the credibility determination rests on "objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). When making the credibility determination, "an ALJ must adequately explain his credibility finding by discussing specific reasons supported by the record." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013); SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016)

(superseding SSR 96-7p).[4] Additionally, while an ALJ is not required to provide a complete written evaluation of every piece of testimony and evidence, reversal and remand is required where the ALJ "provides nothing more than a superficial analysis[.]" *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004). As such, an ALJ cannot simply state that an individual's allegations have been considered or that the individual's allegations are not credible. Rather, the ALJ must "give[] specific reasons for [a credibility] finding, supported by substantial evidence." *Myles v. Astrue*, 582 F.3d 672, 676 (7th Cir. 2009).

The process for evaluating a claimant's symptoms is organized around two major steps. First, the claimant must provide objective medical evidence of a medically determinable impairment or combination of impairments that reasonably could be expected to produce the alleged symptoms. *See* 20 C.F.R. § 404.1529(a)-(b). Second, after the claimant satisfies the first step, the ALJ must then evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. *See* 20 C.F.R. § 404.1529(c). In evaluating allegations of pain, adjudicators are directed to consider whether the symptoms are "consistent with the objective medical [evidence] and other

---

[4]      SSR 96-7p referred to a claimant's "credibility," but SSR 16-3p removed that term to "clarify that subjective symptom evaluation is not an examination of the individual's character." SSR 16-3p, 2016 WL 1119029, at * 1 (Mar. 16, 2016). Instead, ALJs are reminded to "consider all of the evidence in an individual's record when they evaluate the intensity and persistence of symptoms after they find that an individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms," as consistent with the regulations. *Id.* Under either SSR version, the outcome of this case would be the same.

evidence in the individual's record." SSR 16-3p, 2016 WL 1119029, at *2 (Mar. 16, 2016). *See also* 20 C.F.R. § 404.1529(a) (explaining that the agency considers both "objective medical evidence and other evidence" in evaluating whether an impairment affects activities of daily living and the ability to work).

Objective medical evidence is merely one factor to be considered, and an ALJ is not free to "disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual." SSR 16-3p, 2016 WL 1119029, at *5 (Mar. 16, 2016). Other factors that the ALJ should examine include "daily activities, allegations of pain, aggravating factors, types of treatment received and medication taken, and 'functional limitations.'" *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) (quoting 20 C.F.R. § 404.1529(c)(2)-(4)). An ALJ may not disregard subjective complaints "solely because they are not substantiated by objective medical evidence." *Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015); *Vanprooyen v. Berryhill*, 864 F.3d 567, 572 (7th Cir. 2017) (quoting *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009)). *See also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (stating that "[p]ain is always subjective in the sense of being experienced in the brain."). "[P]ain alone can be disabling . . . [therefore] [t]estimony of severe pain cannot be disregarded simply because it is not supported by objective medical evidence." *Stark v. Colvin*, 813 F.3d 684, 688 (7th

Cir. 2016). An ALJ's "failure to adequately explain his or her credibility finding . . . is grounds for reversal." *Minnick v. Colvin*, 775 F.3d 929, 937 (7th Cir. 2015).

Here, the ALJ found that Plaintiff's "medically determinable impairments significantly limit the ability to perform basic work activities as required by SSR 85-28." (Tr. 141). Even so, the ALJ concluded: "I find the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record. From July 13, 2017, through the date of last insured, March 31, 2021, the claimant failed her burden of proving more restrictive functional limitations due to any impairment or combination of impairments." (Tr. 152). Specifically, the ALJ found:

> The medical records document diagnoses and treatment for degenerative disc disease of her lumbar spine, osteoarthritis and fibromyalgia prior to her date last insured. However, objective medical findings by the treating physicians did not include significant deficits in strength, neurological function, range of motion, posture, sensation, reflexes, pulses or gait, or in the ability to squat, stand, walk, sit, lift, carry, bend or stoop. The objective medical findings within the treatment notes do not include long term significant atrophy or spasm. The claimant was not reported to exhibit significant pain behaviors or signs in the forms of abnormal breathing, uncomfortable movement or elevated blood pressure. . . .
>
> Although the medical records show a history of widespread pain that has persisted for three months and there were eleven or more trigger points identified, as well as documentation that coexisting conditions had been excluded, the medical records do not document that such pain had been severe enough to preclude use of full strength or full motion or from engaging in a normal gait. Medical records indicate her pain has not been so severe as to result in inactivity causing atrophy. Such facts indicate although claimant may

have pain, she has been able to walk without deficit, use full motion of joints, bend, lift, carry, sit, stand, use full strength of muscles and to remain active enough to avoid muscle disuse and atrophy. Therefore, the limitation to light work, together with the postural limitations noted above, adequately addresses the claimant's musculoskeletal impairments and obesity through the date last insured.

(Tr. 151).

Here, the ALJ's subjective symptom analysis provides no connection between Plaintiff's symptom testimony and the objective medical evidence to support her conclusion discounting Plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms. The ALJ recited medical evidence that may fit into the Section 1529 categories listed above but failed to discuss all the factors clearly. The ALJ is not specific about why she did not fully credit Plaintiff's testimony concerning her abilities/inabilities to stand, sit, and walk due to pain or her daily limitations regarding bending, lifting, and walking. Instead, the ALJ relied on boilerplate language regarding the treatment and medical records not supporting the limitations described by Plaintiff without explaining why the records contradicted her statements regarding her constant pain, the inability to stand or sit, inability to walk long distances, and the sleepless nights and staying in bed for 20 hours a day. *See, e.g.*, *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012) (noting that "[s]uch boilerplate language fails to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that claimant's complaints were not credible.") (internal citation and quotation marks omitted).

The record contains several limitations on how Plaintiff performs her limited daily activities. For example, Plaintiff, reported that she spends most of the day (20 hours) lying in bed. Specifically, she testified: "I just usually get up and take care of my personal, eat a little breakfast, an apple or something, clean my CPAP machine, brush my teeth and all that, and then I go back to bed and just sit up and eat and go pee." (Tr. 178). Plaintiff reported that her husband does all the household chores including vacuuming, sweeping, dusting, mopping, cooking, and the laundry. She also reported they hire someone to clean the house once a month. (Tr. 174). Plaintiff stated that she only leaves the house to go to doctor appointments. She also averred that the most she could lift was a gallon of milk. (Tr. 181). The ALJ's discussion did not examine the portions of the record which demonstrated that Plaintiff was in bed most of the day, that she was unable to sit, stand or walk regularly throughout the day without severe pain or changing positions, and that she needed assistance during the day due to her symptoms. Further, there is no evidence in the record of malingering or symptoms of magnification. In fact, the record reflects that Dr. Whittenburg, and the doctors at Signature Orthopedics & Premier Care, Inc., who physically examined/treated Plaintiff, noted her many complaints and symptoms, *i.e.*, arthritis, back problems, shoulder pain, knee problems, steroid therapy, cramps in foot/leg, and restless leg syndrome. As such, the Court finds that the ALJ erred

in the way she considered Plaintiff's subjective factors.[5]

The ALJ's error requires remand. "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (internal citation omitted).

This Memorandum & Order should not be construed as an indication that the Court believes that Plaintiff was disabled during the relevant period or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

## CONCLUSION

The Commissioner's final decision denying Plaintiff's application for disability benefits and supplemental security income is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g). The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATED:   February 9, 2024.**

Gilbert C Sison

Digitally signed by
Gilbert C Sison
Date: 2024.02.09
14:05:03 -06'00'

**GILBERT C. SISON**
**United States Magistrate Judge**

---

[5]     As the Court finds that the ALJ committed error regarding Plaintiff's complaints and symptoms which requires remand, the Court need not address Plaintiff's other three arguments.